IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |
|---|---|
| REV. WILLIAM BOOTH : <br> : <br> Plaintiff, : <br> : Civil No. 22-5276 (RBK/SAK) <br> v. : <br> : **OPINION** <br> : <br> CITIZENS BANK, N.A., *et al.* : <br> : <br> Defendants. : | |

**KUGLER**, United States District Judge:

This matter comes before the Court upon Defendant Citizens Bank, N.A.'s Motion to Transfer the Case to the United States District Court for the District of Rhode Island ("Motion" or "Mot.") (ECF No. 10). For the reasons below, the Court **GRANTS** Citizens Bank's Motion.

**I.     BACKGROUND**

    **A.     Factual Background**

        **1.     The Alleged Incident**

Plaintiff Reverend William Booth alleges he went to Citizens Bank in Voorhees, New Jersey on January 23, 2021. (ECF No. 1, "Complaint" or "Compl." at ¶¶ 7, 12). He claims he intended to withdraw $5,000, reset his PIN number, and request a $30,000 cashier's check. (*Id.* at ¶ 12). While there, he allegedly walked up to a teller named Nabeel Bhatti. (*Id.* at ¶ 13). Reverend Booth claims he asked Bhatti if he could speak to a manager, Bhatti said no, and so Reverend Booth explained to him that he needed to reset his PIN, withdraw $5,000, and get a $30,000 cashier's check. (*Id.* at ¶ 14). Bhatti apparently told Reverend Booth that the bank did not keep that amount of money on hand. (*Id.* at ¶ 15). When Reverend Booth expressed his

1

confusion, Bhatti allegedly told him that to make a withdrawal that large, he would have to call ahead to schedule the withdrawal beforehand, but he could get the $30,000 cashier's check. (*Id.* at ¶¶ 16, 21). Reverend Booth alleges Bhatti's claim was false and Citizens Bank does not have such policy. (*Id.* at ¶ 17).

As the discussion continued, Reverend Booth alleges that Bhatti told him the maximum amount he could withdraw at that time was $2,500, to which Reverend Booth says he agreed. (*Id.* at ¶ 19). Reverend Booth then claims that Bhatti asked for identification and for Reverend Booth to pull down his mask while Bhatti was looking at his driver's license. (*Id.*). While he waited, Reverend Booth, a Black man, purportedly saw three other customers, allegedly all White, come into the bank and withdraw money. (*Id.* at ¶ 20). The teller who assisted these White customers allegedly did not ask them to pull their masks down when they made their withdrawals. (*Id.*). Reverend Booth makes no claim, though, about how much money any of these other customers allegedly withdrew.

At the end of the transaction, Reverend Booth claims Bhatti asked if a bank officer could call him to discuss financial opportunities. (*Id.* at ¶ 22). Reverend Booth says he agreed, and when the officer, Robbie Williams, called a couple days later, he complained to her about his experience with Bhatti and how he felt Bhatti racially discriminated against him. (*Id.* at ¶ 23). According to Reverend Booth, Williams confirmed to him that Citizens Bank has no such policy for large withdrawals. (*Id.*). Reverend Booth claims she said she would look into it and call him back, but she never did. (*Id.*). Additionally, Reverend Booth claims he visited two other Citizens Bank locations to inquire about the bank policy Bhatti told him existed. (*Id.* at ¶ 24). Allegedly, both locations told Reverend Booth there was no bank-wide large withdrawal policy, and that if he wanted to withdraw $5,000, he could. (*Id.*).

### 2. The Agreement

When Reverend Booth opened his account with Citizens Bank, he signed a signature card. (ECF No. 10-3, Declaration of Kevin Farrell, "Farrell Decl." at ¶ 3; ECF No. 10-4, Farrell Decl., Ex. A). By doing so, Reverend Booth agreed that:

> By signing below, I acknowledge that I have read and understood the Bank's Deposit Account Agreement ["PDAA"] . . . as amended from time to time (all collectively and each individually referred to as "the Agreement"). By signing below, I agree to all the terms of the Agreement.

(Farrell Decl., Ex. A).

Importantly, the PDAA contains an Arbitration Agreement. To begin, the PDAA's Table of Contents labels Section XXII: Arbitration. (ECF No. 10-5, Farrell Decl., Ex. B at 3; ECF No. 10-8, Farrell Decl., Ex. E at 3). At the very beginning of that Arbitration Agreement, it reads in all capital letters: "READ THIS SECTION CAREFULLY AS IT WILL HAVE A SUBSTANTIAL IMPACT ON HOW LEGAL DISPUTES BETWEEN YOU AND US ARE RESOLVED." (Farrell Decl., Ex. B at 26) (emphasis in original).

As relevant here, the Arbitration Agreement goes on to say:

> If you have a dispute with us, and we are not able to resolve the dispute informally, you and we agree that upon demand by either you or us, the dispute will be resolved through the arbitration process as set forth in this part. A "claim" or "dispute," as used in this Arbitration Agreement, is any unresolved disagreement between you and us, arising from or relating in any way to the Account Agreement . . . or the deposit relationship between us.

(*Id.* at 26–27). The Arbitration Agreement defines the terms "we," "us," and "our" to include not just Citizens Bank itself, but also Citizens' employees. (*Id.* at 26). After further defining arbitrable claims, the Arbitration Agreement states:

> However, "claim" or "dispute" as used in this Arbitration Agreement does not include any dispute or controversy about the validity, enforceability, coverage or scope of this Arbitration Agreement or any part thereof . . . ; all such disputes or controversies are for a court and not an arbitrator to decide; . . . ANY DISPUTE CONCERNING THE VALIDITY, ENFORCEABILITY, COVERAGE OR

> SCOPE OF THIS ARBITRATION AGREEMENT SHALL BE RESOLVED IN A RHODE ISLAND STATE OR FEDERAL COURT OF LAW, AND THE PARTIES HEREBY SUBMIT TO THE JURISDICTION OF SUCH A COURT FOR SUCH PURPOSE.

(*Id.* at 27) (emphasis in original).

The Arbitration Agreement also affords Citizens Bank customers an opportunity to opt out of the Arbitration Agreement and provides instructions on how to do so. (*Id.* at 29). Reverend Booth never opted out. (Farrell Decl. at ¶ 6).

### B.     Procedural History

After the alleged incident, Reverend Booth responded by filing the instant action in this Court on August 29, 2022. (ECF No. 1). He alleges three claims: (1) racial discrimination in violation of 42 U.S.C. § 1981; (2) racial discrimination in violation of the New Jersey Law Against Discrimination (NJLAD); and (3) intentional infliction of emotional distress (IIED). (*Id.* at 25–39). Reverend Booth served Defendants on September 29, 2022. (ECF Nos. 3–4). Citizens Bank applied for a Clerk's Order for an extension of time to answer pursuant to Local Civil Rule 6.1(b), which the Clerk of Court granted. (ECF No. 5). The deadline for Citizens Bank to answer, move, or otherwise respond became November 3, 2022. (*Id.*).

Citizens Bank filed this Motion on that day. (ECF No. 10). Reverend Booth opposed the Motion on December 2, 2022. (ECF No. 16, "Pl. Opp'n"). Citizens Bank replied on December 12, 2022. (ECF No. 17, "Def. Reply"). Reverend Booth also filed a sur-reply to this Motion. (ECF No. 18). Unfortunately, Local Civil Rule 7.1(d)(6) states, "No sur-replies are permitted without the permission of the Judge or Magistrate Judge to whom the case is assigned." Reverend Booth never asked for any such permission to file his sur-reply. We will not grant permission now and therefore will not consider it.

## II.     LEGAL STANDARD

28 U.S.C. § 1404(a) provides that "[f]or the convenience of the parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." When presented with simultaneous questions of venue and arbitrability, a court must decide the venue issue first. *Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 95–96 (3d Cir. 2018). Before making that determination, though, the court must decide whether the forum selection clause is applicable to the matter in question. *Id.* at 97.

If it is, it is well settled that a motion to transfer under § 1404(a) is the appropriate procedural mechanism to enforce a forum-selection clause. *See Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 63 (2013). When a forum-selection clause exists, "district courts [must] adjust their usual § 1404(a) analysis in three ways." *Id.* Namely, "district courts (1) must give no weight to the forum preferred by 'the party defying the forum-selection clause'; (2) must deem the private interests to 'weigh entirely in favor of the preselected forum' because the parties agreed to the preselected forum and thereby waived the right to challenge it as inconvenient; and (3) must proceed to analyze only public interests." *In re: Howmedica Osteonics Corp.*, 867 F.3d 390, 402 (3d Cir. 2017) (quoting *Atl. Marine*, 571 U.S. at 581−82). Those public interest factors are:

> [1] the enforceability of the judgment; [2] practical considerations that could make the trial easy, expeditious, or inexpensive; [3] the relative administrative difficulty in the two fora resulting from court congestion; [4] the local interest in deciding local controversies at home; [5] the public policies of the fora; and [6] the familiarity of the trial judge with the applicable state law in diversity cases.

*Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879–80 (3d Cir. 1995) (citations omitted). Because "those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Atl. Marine*, 571 U.S. at 64.

## III.     DISCUSSION

In the event Reverend Booth challenges the Arbitration Agreement's applicability to his claims (which he does), Citizens Bank seeks to transfer this matter to the United States District Court for the District of Rhode Island pursuant to 28 U.S.C. § 1404(a) and the forum selection clause contained within the Arbitration Agreement. (Mot. at 1, 6). Citizens Bank maintains that Reverend Booth agreed to that clause when he opened his Citizens Bank account, and it requires we transfer this case. (*Id.* at 1, 6–10).

Reverend Booth counters that this Court should not transfer the case to Rhode Island. (Pl. Opp'n at 1). He argues that because he opened his bank account in New Jersey, the alleged incident occurred in New Jersey, and he never read the agreement which contained the forum-selection clause, the matter should remain before this Court. (*See id.*). Perplexingly, Reverend Booth spends a few pages of his brief discussing the legal standard for reviewing motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (*Id.* at 2–4). Reverend Booth presents this argument even though there is no Rule 12(b)(6) motion to dismiss before this Court. This is a motion to transfer venue pursuant to § 1404, or, alternatively, compel arbitration. The Court will review this case as such.

As a preliminary matter, we note that the parties essentially contest whether Defendant Bhatti exists. Whether he does or not is irrelevant at this point in the proceedings since Reverend Booth claims Bhatti was a Citizens Bank employee, and the Arbitration Agreement covers Citizens Bank employees. (*See* Farrell Decl., Ex. B at 26). Therefore, for purposes of this

Motion, we will assume he exists and, according to Reverend Booth's allegations, was the employee he encountered at the Voorhees, New Jersey location.

Reverend Booth signed the signature card when he opened his Citizens Bank accounts and thereby agreed to the Arbitration Agreement within the PDAA. Further, arbitrability questions exist here. What's more, Reverend Booth has failed to present any compelling reasons why the Court should not enforce the forum-selection clause that he willingly entered with Citizens Bank to decide such questions. Finally, the *Jumara* public interest factors favor transfer. As such, this Court grants Citizens Bank's Motion and orders the case transferred to the District of Rhode Island to properly consider the arbitrability of Reverend Booth's claims.

### A.     The Forum Selection Clause Applies Here

In *Atlantic Marine*, the Supreme Court said, "[w]hen parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations." 571 U.S. at 583. In other words, "[i]n all but the most unusual cases, . . . 'the interest of justice' is served by holding parties to their bargain." *Id.* The Third Circuit applied this language to conclude that "claims concerning those parties [who agree to forum-selection clauses] should [typically] be litigated in the fora designated by the clauses." *In re: Howmedica*, 867 F.3d at 404. Accordingly, in the Third Circuit, "forum-selection clauses are presumptively valid." *Cadapult Graphic Sys., Inc. v. Tektronix, Inc.* 98 F. Supp. 2d 560, 564 (D.N.J. 2000) (quoting *Reynolds Publishers, Inc. v. Graphics Fin. Grp., Ltd.*, 938 F. Supp. 256, 263 (D.N.J. 1996)).

A party may challenge a forum-selection clause's presumptive validity by "mak[ing] a 'strong showing' that the clause is 'unreasonable.'" *Id.* (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)). The party can show unreasonableness only if:

7

>   the party objecting to its enforcement establishes (1) that it is the result of fraud or overreaching, (2) that enforcement would violate a strong public policy of the forum, or (3) that enforcement would in the particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable.

*Id.* (quoting *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 202 (3d Cir. 1983); *Union Steel Am. Co. v. M/V Sanko Spruce*, 14 F. Supp. 2d 682, 686 (D.N.J. 1998)).

The Arbitration Agreement states, in relevant part: "ANY DISPUTE CONCERNING THE VALIDITY, ENFORCEABILITY, COVERAGE OR SCOPE OF THIS ARBITRATION AGREEMENT SHALL BE RESOLVED IN A RHODE ISLAND STATE OR FEDERAL COURT OF LAW, AND THE PARTIES HEREBY SUBMIT TO THE JURISDICTION OF SUCH A COURT FOR SUCH PURPOSE." (Farrell Decl., Ex. B at 27) (emphasis in original). The signature card, which Reverend Booth signed, confirms that Reverend Booth read and understood the PDAA, which contains the Arbitration Agreement and its all-caps forum-selection clause, and agreed to its terms. (Farrell Decl. at ¶ 3; Farrell Decl., Ex. A).

Reverend Booth has not established that this forum-selection clause is unreasonable. He has not shown in any way that he only agreed to the forum-selection clause because of any fraud or overreaching by Citizens Bank. Reverend Booth's main argument is that Citizens Bank never presented the PDAA to him or discussed it directly with him when he opened his accounts. (*See* Pl. Opp'n at 1–2). Since he never received the PDAA, Reverend Booth argues, and therefore never read it, we should not hold him to its terms. (*See id.*).

Unfortunately for Reverend Booth, a failure to read an agreement does not free a party from its terms. *See Diversified Home Installations, Inc. v. Maxwell Sys. Inc.*, No. 09-6393, 2010 WL 1133773 at *6 (D.N.J. Mar. 22, 2010); *see also Petrozzino v. Vivint, Inc.*, No. 20-cv-01949, 2020 WL 7778039, at *3 (D.N.J. Dec. 31, 2020); *Doe v. Bank of Am., N.A.*, Civ. No. 16-3075, 2018 WL 295565, at *5 (D.N.J. Jan. 3, 2018). The analysis rests on whether "the provision had

been reasonably communicated by the agreement, not whether the party actually read it." *Id.* When Reverend Booth opened his Citizens Bank accounts, Citizens Bank presented him with, and, most importantly, *he signed* a signature card. (Farrell Decl. at ¶ 3; Farrell Decl., Ex. A). That signature card stated plainly that by signing it, Reverend Booth read the PDAA, understood it, and agreed to its terms. (*Id.*). The signature card clearly communicated its purpose and intent.

Reverend Booth spills a considerable amount of ink contending that he never received a copy of the PDAA, never read it, and no Citizens Bank representative took the time to explain every applicable provision within the PDAA to him. But Reverend Booth could have asked to read the PDAA before signing the signature card. Had he done so, he would have seen a clearly labeled section titled "Arbitration." (Farrell Decl., Ex. B at 3). At the beginning of that section, he would have seen an ALL-CAPS statement to read that section carefully because it affects how legal disputes between Reverend Booth and Citizens Bank will be resolved. (Farrell Decl., Ex. B at 26). He then would have seen the substance of the Arbitration Agreement as well as the arbitrability forum-selection clause at issue here. It does not matter that the signature card itself did not mention the Arbitration Agreement or its forum-selection provision because the signature card clearly communicated that Reverend Booth was agreeing to the PDAA by signing it, and the PDAA clearly communicated the Arbitration Agreement and its forum-selection clause. *See Smith v. Legal Helpers Debt Resol. LLC*, No. 11-5510, 2012 WL 2118132, at *2 (D.N.J. June 11, 2012).

Further, just because this is an adhesion contract does not invalidate the PDAA's terms or the lawfulness of the forum-selection clause within the Arbitration Agreement. *Union Steel Am. Co. v. M/V Sanko Spruce*, 14 F. Supp. 2d 682, 686 (D.N.J. 1998). Reverend Booth's failure to

9

read the agreement before signing a signature card stating he had, in fact, read it and agreed to its terms is his own fault, not fraud or overreaching.

Additionally, Reverend Booth does not argue that enforcing the forum-selection clause would violate a strong public policy in New Jersey. Nor could he. *See Mancuso v. L'Oreal USA, Inc.*, No. 20-5701, 2021 WL 365228, at *6 (D.N.J. Feb. 1, 2021) (stating that New Jersey public policy favors enforcing contractual provisions, including forum-selection provisions).

Finally, Reverend Booth has not shown that enforcing the forum-selection clause here will "result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable." Reverend Booth argues that to litigate a case in Rhode Island, he would have to "expend unnecessary costs and expenses[,]" go to a State to which he has never been, and suffer "significant [financial] hardship." (*See* Pl. Opp'n at 16–17). Distance between fora, though, does not prove unreasonableness. *See Woodell v. Coach*, No. 2:22-cv-2222, 2022 WL 17486262, at *2–3 (D.N.J. Dec. 7, 2022) (concluding that a party failed to establish unreasonableness despite their argument that travel from New Jersey to Michigan presented inconvenience). Neither, necessarily, do financial hardships. *See Kalawa v. United States*, No. 19-16089, 2020 WL 3603205, at *5 (D.N.J. July 2, 2020) (reasoning that New Jersey and Maryland are not too geographically distant and thus would not impose any unique or unusual financial hardship); *see also Heartland Payment Sys., Inc. v. Commer*, No. 07-2348, 2007 WL 3275097, at *2 (D.N.J. Nov. 5, 2007) (saying that a court should only find a forum-selection clause unenforceable when "the selected forum would be so inconvenient as to deprive the party of his day in court") (citation omitted).

For all these reasons, given the high bar the law sets to show a forum-selection clause is unreasonable, Reverend Booth has not come close to making an adequate showing of

10

unreasonableness. We find that the PDAA reasonably and clearly communicated its terms, and that Reverend Booth signed a signature card stating that he read the PDAA, understood it, and agreed to abide by its terms. Reverend Booth does not contest that is his signature on the signature card. (*See generally* Pl. Opp'n). In fact, he includes as an exhibit to his opposition brief an updated signature card, also with his signature on it. (*Id.*, Ex. 1 at 5). That is sufficient to hold him to the PDAA's terms, including the forum-selection clause. The PDAA contemplates that a Rhode Island court will resolve arbitrability questions (i.e., the validity, enforceability, coverage, or scope of the Arbitration Agreement). Reverend Booth objects to the Arbitration Agreement's applicability to his claims, thereby raising arbitrability questions. As such, so long as the public interest factors do not require otherwise, we will hold the parties to their bargain.

Thus, we will next assess the public interest factors.

### B.     The Public Interest Factors Favor Transfer

Because there is a valid forum-selection clause here, *Atlantic Marine* compels us to next analyze only the public interest factors for transfer. *In re: Howmedica*, 867 F.3d at 402 (quoting *Atl. Marine*, 571 U.S. at 581–82). As a reminder, those factors are:

> [1] the enforceability of the judgment; [2] practical considerations that could make the trial easy, expeditious, or inexpensive; [3] the relative administrative difficulty in the two fora resulting from court congestion; [4] the local interest in deciding local controversies at home; [5] the public policies of the fora; and [6] the familiarity of the trial judge with the applicable state law in diversity cases.

*Jumara*, 55 F.3d at 879–80 (citations omitted).

When analyzing these public interest factors, district courts have the discretion to determine the weight that each factor receives under the circumstances presented. *See id.* at 883 (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 30–31 (1998) ("[§] 1404(a) was intended to vest district courts with broad discretion to determine, on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in favor of transfer."); *see also*

*Lord v. Accenture LLP*, No. 21-8646, 2021 WL 5980339, at *7 (D.N.J. Dec. 17, 2021) (citing *Kalawa*, 2020 WL 3603205 at *4). Of the six *Jumara* factors, factors three and five support transfer; factors one, two, and six are neutral; and only factor four weighs against transfer.[1] As such, we find that the public interest factors support transfer.

Factors three and five support transfer. The third factor favors transfer due to the great congestion this Court, though improving, still faces relative to the District of Rhode Island. *See United States District Court – National Judicial Caseload Profile*, U.S. COURTS, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2022.pdf (last visited June 8, 2023) (showing, as of September 30, 2022, just 936 cases pending in the District of Rhode Island compared to 64,678 in the District of New Jersey). The fifth factor also supports transfer because "as a general matter, enforcement of forum selection clauses is not contrary to public policy." *Caspi v. Microsoft Network, L.L.C.*, 323 N.J. Super. 118, 123 (App. Div. 1999). What's more, as previously stated, New Jersey public policy strongly favors enforcing forum-selection provisions. *Mancuso*, 2021 WL 365228 at *6.

Factors one, two, and six are neutral. The first factor is neutral because "it is unlikely that there would be any significant difference in the difficulty of enforcing a judgment rendered by one federal forum or the other[.]" *In re Howmedica*, 867 F.3d at 410 (quoting 1 James Moore, et al., *Moore's Manual: Federal Practice and Procedure*, § 7.81[3][b] (2017)). The second factor is neutral because no "practical considerations, including judicial economy," weigh in favor or against transfer here. *See Lord*, 2021 WL 5980339 at *6. Even though the "incident . . . occurred here in New Jersey," (Pl. Opp'n at 16), we do not believe any witnesses located here in New

---

[1] Because Citizens Bank presents cogent arguments regarding why these factors overall favor transfer, and Reverend Booth does not address any of these arguments or the public interest factors at all in his opposition brief, we consider any arguments in opposition waived. *See Woodell*, 2022 WL 17486262 at *3.

Jersey would be severely inconvenienced if either party called them to testify in Rhode Island. Further, if it becomes impractical for a witness to appear in Rhode Island in person, the ubiquity of Zoom and other video- and teleconferencing technology should alleviate those issues. Finally, the sixth factor is neutral because, although this Court may have more familiarity with the NJLAD, we have "full faith in the judges of the District of [Rhode Island] to properly apply" it. *See ComTec Sys., Inc. v. Farnam Street Fin. Inc.*, No. 21-cv-19406, 2021 WL 5997991, at *3 (D.N.J. Dec. 20, 2021).

Only factor four weighs against transfer. New Jersey certainly has an interest in adjudicating this case in New Jersey. The alleged incident occurred entirely in New Jersey, and the allegations of racial discrimination are serious. Still, this factor is merely one weighed among six total factors, and we find that it does not hold any greater relative weight than any other individual factor.

Because two factors support transfer, three factors are neutral, and only one factor weighs against transfer—and all six factors hold relatively equal weight—we find that the public interest factors support transfer. Thus, given that the forum-selection clause for adjudicating arbitrability questions applies here and is enforceable, and the public interest factors favor transfer, we will grant Citizens Bank's Motion and transfer this case to the District of Rhode Island.

### IV. CONCLUSION

For these reasons, the Court **GRANTS** Citizens Bank's Motion (ECF No. 10). An appropriate order follows.

Dated: June 9, 2023               /s/ Robert B. Kugler
                                  ROBERT B. KUGLER
                                  United States District Judge